IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | | |
|---|---|---|
| DARRELL W. GORHAM, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 05-0298-CV-W-NKL |
| | ) | |
| JO ANNE BARNHART, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

ORDER

Pending before the Court is Plaintiff Darrell W. Gorham's ("Gorham") Motion for

Summary Judgment [Doc. # 8]. Gorham seeks judicial review of the Commissioner's

denial of his request for supplemental security income benefits, under Title II of the

Social Security Act, 42 U.S.C. §§ 401 *et seq.* The Administrative Law Judge ("ALJ")

found that Gorham was not entitled to benefits, and such determination became the final

decision of the Commissioner when the Appeals Council denied Gorham's request for

review. Gorham has exhausted his administrative remedies, and jurisdiction is conferred

on this Court pursuant to 42 U.S.C. § 405(g).

I.      **Background**

        A.      **Summary of Medical and Documentary Evidence**

On April 18, 1997, Gorham presented to Joseph DeBlase, D.O., with complaints of dizziness. Dr. DeBlase diagnosed sinusitis and possible strep. (Tr. 273.) Gorham returned to Dr. DeBlase on April 28, 1997, for a magnetic resonance imaging (MRI) scan of the head to rule out a mass due to his complaints of severe pain in the base of his skull, headaches, and dizziness. The MRI indicated a left-sided, paramedian, posterior fossa arachnoid cyst without consequence. (Tr. 264.)

On June 3, 1997, Gorham presented to Dr. DeBlase with complaints of continued headaches and neck aches. Gorham reported not sleeping very well and noticing a lump on the right side of his neck in the post auricular area. Physical examination revealed a right post auricular lump, which was probably a muscle spasm. Dr. DeBlase diagnosed a muscle contracture headache versus tension, and prescribed Elavil. (Tr. 272.)

On August 4, 1997, Gorham presented to the Medical Center of Independence (MCI) with complaints of a sudden onset of weakness and shaking. He was diagnosed with rectal bleed (hemorrhoids) and irritable bowel syndrome. (Tr. 229.) On August 8, 1997, Gorham presented to Valerie Sommer, M.S.N., F.N.P., with complaints of dizziness over the last several days. He thought it was from low blood sugar, but it was not improved within four hours after having eaten a candy bar. He was seen in the emergency room (ER) the previous day at MCI for what initially was going to be blood in the stools, but on the way to the hospital, driving himself, he felt an overall weakness and shakiness and pulled off to have the ambulance come and assist him. At the time the ambulance arrived, his blood pressure was 167/116 and he was quite weak and dizzy and

2

shaky.  He also complained of epigastric pain relieved with 8-10 Tums daily.  His

diagnoses were vertigo, rectal bleeding, and epigastric reflux.  (Tr. 271.)

On August 26, 1997, Gorham presented to North Kansas City Hospital with

complaints of feeling shaky, dizzy, and near-syncopal.[1]  He reported he had returned to

work that day after being off for three weeks when he started to get shaky, dizzy, and felt

near-syncopal.   He was headed home from work when it got worse and he decided to

come to the hospital and get evaluated.  Gorham had a prior history of this, and had been

undergoing a work up.  A prior glucose tolerance test apparently showed he was

hypoglycemic.  His blood pressure had also been elevated with muscle cramps.  He

reported these episodes had gone on for the past three weeks but could not think of any

events that might have brought on the episodes.  Physical examination revealed his

standing blood pressure was 153/92.  The assessment was near-syncope.  (Tr. 211-12.)

On August 28, 1997, an electroencephalogram (EEG) was normal.  The reviewing

physician noted that a normal EEG does not necessarily rule out a seizure disorder, and

recommended clinical correlation.  (Tr. 226-27.)  On August 29, 1997, Gorham presented

to Charles D. Donohoe, M.D., for a neurological consultation.  Gorham reported a four

month history of headaches and several episodes where his hands became cold, he broke

out into a sweat, and became very tachycardic with shaking all over his body.  On several

occasions he nearly passed out.  Despite his history, Gorham denied any emotional stress

or anxiety.  Dr. Donohoe concluded Gorham's episodes were most consistent with panic

---

[1]A brief loss of consciousness caused by a temporary deficiency of oxygen in the brain.

3

related disorder. He advised Gorham to keep a strict record of his spells. He discontinued Elavil and prescribed Paxil 20 mg. (Tr. 214-15.)

On September 8, 1997, Gorham presented to Dr. DeBlase with complaints of ongoing abdominal pain even while taking Prilosec. He reported seeing a neurologist for his "spells." The neurologist felt that his "spells" were panic attacks and prescribed Paxil which he discontinued after one week due to abdominal pain. Dr. DeBlase concurred with the neurologist assessment. Physical examination revealed tenderness in the abdomen, especially in the infra umbilical area. Dr. DeBlase diagnosed cerebral vascular and panic attacks. He prescribed Levabid and Paxil. (Tr. 269.) On September 15, 1997, Gorham returned complaining of increased stomach problems. He also complained of a sore throat and neck pain with dizziness. Physical examination revealed tonsillitis and pharyngitis with reactive lymphadenopathy. Dr. DeBlase diagnosed recurrent headache, dizziness, nausea, vomiting, upper respiratory infection (URI)/tonsillitis, and ruled out panic attacks. He discontinued Paxil and prescribed Serezone and Lorabid. (Tr. 268.)

On September 19, 1997, Gorham presented to Dr. Donohoe with ongoing complaints of headaches, dizziness, upset stomach, and chest pain. Gorham reported he did not respond to Paxil. Dr. Donohoe prescribed Neurontin and noted that if Gorham did not improve, he would consider doing an occipital nerve block and/or a magnetic resonance angiogram of his brain. (Tr. 216.)

4

On November 6, 1997, Gorham returned to Dr. DeBlase for a recheck. Gorham complained of severe tinnitus[2] and decreased hearing. Physical examination revealed a negative ear, nose and throat (ENT) examination. Dr. DeBlase assessed Meniere's syndrome and recommended follow up with Dr. McKenzie for continued therapy. (Tr. 267.)

On December 2, 1997, Gorham presented to Nurse Sommer for follow up of his Meniere's disease. He requested an MRI for headaches he had been having more recently, a referral to a new neurologist, as well as a referral back to Dr. Mackenzie, the ENT doctor he had seen previously. Gorham reported experiencing hot flashes, dizziness, and intense headaches over the right occipital, temporal and parietal areas to the extent that he had to pull his car over and notify his father to come get him from his destination. This occurred the previous day. Since that time, usually in the evening, he experienced right sided pain with facial numbness. On occasion, he felt like there was water running in his right ear. Dr. Mackenzie initially diagnosed the Meniere's disease and placed Gorham on a Medrol Dosepak. He increased the Dyazide. Gorham complained of occasional head congestion, but denied any earaches, sore throat, cough or productive sputum. Physical examination revealed complaints of pressure behind the globes of the eyes. He was assessed with Meniere's disease. Dr. DeBlase was consulted and he referred Gorham to Dr. J. Robinson, a neurologist, and back to Dr. Mackenzie, the ENT doctor. (Tr. 266.)

_____

[2]A sensation of ringing in the ears.

Case 4:05-cv-00298-NKL   Document 14-3   Filed 05/15/06   Page 5 of 35

On January 16, 1998, Gorham returned to Dr. DeBlase with complaints of chest burning and discomfort when lying down. He reported shaking all the time and experiencing a lot of post prandial nausea and indigestion. Gorham stated he had been seen by several specialists, neurologist, ENT, and dizzy specialists, all to no avail. His dizziness and unsteadiness persisted. The nausea was getting worse. Physical examination revealed negative abdomen and ENT. Neurologically, he seemed fairly uptight, especially with his children, who were running around the room "driving him crazy." Dr. DeBlase diagnosed persistent dizziness with nausea and vomiting and probable Gastroesophageal reflux disease (GERD). He prescribed Compazine and Prilosec. (Tr. 265.)

On January 16, 1998, Gorham came to the ER at MCI with complaints of chest pain occurring primarily at night, on and off now for about two weeks. He reported no radiation to the neck or down the arms. The pain worsened when lying flat. He seemed to get better if he walked around or went outside. This night, Gorham had an episode where he began perspiring. He had decreased appetite and reported getting nauseated quite a bit. A history of skull fracture as a child, Meniere's disease, and difficulty swallowing were noted. He was recently placed on perphenazine for nausea. Physical examination revealed slight epigastric tenderness of the abdomen. Gastroesophageal reflux disease (GERD) was diagnosed. Gorham was given a GI cocktail which offered some relief in ER. He was placed on Prilosec 20 mg, carafate suspension, and a bland diet. (Tr. 219-20.)

6

On March 12, 1998, Gorham presented to Charles M. Luetje, M.D., of Otologic Center, for a neurotological consultation. The primary reason for this was a second opinion regarding Meniere's disease, and the proposed operation suggested by Dr. McKenzie. Apparently, a diagnosis of Meniere's disease in the left ear had been made and endolymphatic sac decompression surgery suggested. Dr. Luetje noted that Gorham's symptoms dated back to childhood, when on an annual basis or thereabouts, he would have spells of vertigo which would last up to a day. These were spontaneous and without known cause. He fell backwards at age 18 months and, apparently, there was a compression skull fracture posteriorly. He continued to have these spells of dizziness about once a year, or maybe less frequently until the last year or two when they became more frequent. Gorham also described what he felt to be a floating type of disequilibrium on a daily basis. The slightest movement of a chair abruptly, on which he is sitting, caused him to be vertiginous. Currently, if he had a spell of vertigo, it may last for a day or day and a half, sometimes less. There were no hard cochlear symptoms of Meniere's disease. However, Gorham did experience ringing in both ears, perhaps maybe a little louder on the left, and symmetrical bilateral high frequency sensorineural hearing loss. Hearing in the lower frequencies is symmetrical and normal. Gorham told Dr. Luetje that when he underwent an electronystagmography (ENG) he became violently dizzy and it took quite a while for that to subside. He has tried many medications without help. He gave up caffeine, did not smoke, and was on a low salt diet. None of this seemed to make any difference. Dr. Luetje found it hard to establish the diagnosis of Meniere's disease

based on Gorham's symptoms.  He thought it sounded as though he had a hyper vestibular system.  He indicated that he would put Gorham on a low dose of Valium, a vestibular suppressant and Probanthine, a parasympathetic blocker, three times a day for the next couple of months to see if these helped.   (Tr. 241-42.)

On April 7, 1998, Gorham presented to Dr. DeBlase for a recheck on his dizzy spells, headaches, and depression.  He reported that he had seen several ear doctors.  Gorham reported that he was told that he probably did not have Meniere's syndrome and that he might have a "lesion" in his ear.  Surgery had been recommended, but he was not sure of this right now.  He continued having dizzy spells, headaches and tinnitus.  He was not sleeping well and felt somewhat depressed because of all of this.  Physical examination revealed bilateral serous inflamation of the ear.  Dr. DeBlase diagnosed persistent spells of vertigo lasting up to one day, situational depression secondary to the vertigo, and acute and recurrent cephalalgia.  He prescribed Valium, Probanthine, and Prozac.  (Tr. 261.)

On May 4, 1998, Gorham presented to Dr. DeBlase with complaints of dizziness and weak spells.  He wanted to know if he had been checked for Lyme disease.  He was an avid hunter and always "getting ticks."  Physical examination was unchanged.  He was assessed with dizzy spells, and ruled out labyrinthian hydrops.  He was to continue Valium, Probanthine.  (Tr. 260.)

On June 2, 1998, Dr. Leutje noted Gorham presented with continued complaints of imbalance and vertigo.  Until the matter was resolved with appropriate diagnosis and

treatment, Dr. Leutje stated Gorham would not be able to return to work. Dr. Luetje recommended Gorham discontinue Prozac, Probanthine, and Valium in preparation for testing. The tests included platform posturography and rotational chair study with infrared occular motor analysis. Dr. Luetje maintained that the problem was related to the vestibular system and he did not think it was Meniere's disease. He felt that the only rationale for Meniere's disease was ECOG, which was apparently normal. Gorham related that when he put his head down on the right, in bed, he frequently became imbalanced. A month or so prior, he had an acute attack of vertigo when he laid down on his left ear to get comfortable. (Tr. 238-40.)

On June 24, 1998, Gorham presented to Midwest Ear Institute for rotary chair testing. Examination of sinusoidal acceleration demonstrated his gain was essentially within normal limits. There was an increase in phase noted at the two highest test frequencies, .08 and .16 Hz. However, the phase was within normal limits at the three lowest test frequencies. There was a left sided asymmetry noted at the three lowest test frequencies. The spectral purity was essentially within normal limits. Sensory organization tests were normal. (Tr. 231-32.)

On June 29, 1998, Gorham presented to Dr. Leutje following vestibular testing. He underwent platform posturography, rotational chair sinusoidal harmonic acceleration and infrared ocular motor analysis. The platform posturography study was normal. On rotational chair studies, he had a little bit of left asymmetry, but without phase lag. On head shake with infrared occular motor analysis, there was a little bit of right beating

9

nystagmus for about 14 seconds. This was only 1 or 2 degrees per second and it stopped after 14 seconds. He demonstrated a little bit of nystagmus with upward gaze on gaze testing. Given all these factors, Dr. Luetje did not believe there was a specific side that was causing vestibular dysfunction. He did not believe the findings were that significant or indicated any severe vestibular abnormalities. Dr. Luetje noted it was hard to precisely diagnose the problem. He believed there was some connection between the anxiety and panic spells, and Gorham's vestibular function. He noted further that Gorham's reaction was more that of a hyperactive vestibular system than one that has one side not functioning compared to the others. Dr. Luetje did not want Gorham to take any medication other than Prozac, which might be helpful for him. He encouraged Gorham to begin some exercises and some small daily activities, gradually increasing those in intensity and frequency, including driving, to see if he could somehow work through this. (Tr. 234-35.)

On December 7, 1998, Gorham presented to Dr. DeBlase requesting information on disability. He had been off work for a year and a half with severe debilitating dizziness and frequent cephalalgia. He had been treated with several medications and had seen several specialists for his dizziness, and several neurologists. He had MRI's, CAT scans and laboratory work all to no avail. Dr. DeBlase noted that he and all the other doctors had been unable to stop the dizziness and he suggested that Gorham might want to consider disability because he was unable to work in his present condition. Physical

examination was unchanged. Dr. DeBlase diagnosed recalcitrant dizziness with frequent debilitating cephalalgia and situational depression secondary to the above. He prescribed Serezone 50 mg, increasing to 150 mg., and advised Gorham to apply for disability. (Tr. 259.)

On February 15, 1999, Gorham presented to Dr. DeBlase with ongoing burning, piercing ache extending from the top of the eye socket, across head, down back/sides of neck and anterior shoulders. He also had chest pain. He reported dizziness to the point he rarely drove, nausea and vomiting. His worst pain was in the neck, on the right side. He was assessed with atypical migraine versus questionable Meniere's versus dysfunctional chronic pain cycle. (Tr. 258.)

On November 19, 1999, Gorham presented to Dr. DeBlase after experiencing another episode of dizziness and jitteriness on the inside. He had discontinued all his medications and he was still dizzy. He was not working and had "tremors all the time." Dr. DeBlase assessed dizziness, tremor, and secondary situational depression. He prescribed Remeron 15 mg, increasing to 30 mg. (Tr. 257.)

On June 28, 2000, Gorham presented to Dr. DeBlase with complaints of dizziness and headaches. His blood pressure was elevated at 140/100. Physical examination revealed a negative ENT examination. Dr. DeBlase assessed elevated blood pressure, chronic dizziness, probable panic attacks, and situational depression. He prescribed Inderal and Remeron. (Tr. 256.)

11

On October 10, 2000, Gorham presented to Dr. DeBlase with complaints of ongoing headaches, dizziness, and internal trembling. Dr. DeBlase noted Gorham was not taking Inderal. He ordered MRI/MRA testing. (Tr. 252.) On October 12, 2000, Gorham presented for an MRI of the brain due to indications of arachnoid cysts, headaches and dizziness that worsened over the past two weeks. The MRI revealed a small extra-axial fluid collection posteriorly that possibly represented an arachnoid cyst or could be a Dandy Walker-type complex. There was apparent narrowing in the carotid siphon bilaterally. This was likely artifactual in nature, as there was some disruption of the laminar flow in this area. (Tr. 253-54.)

On December 13, 2000, Gorham presented to Dr. DeBlase with complaints of "still unbearable" headaches. Physical examination revealed increased tenderness of the extremities. Dr. DeBlase assessed head pain and severe fatigue. (Tr. 248.) On December 26, 2000, Gorham again complained of headaches and dizziness. Dr. DeBlase assessed vascular cephalgia and dizziness. (Tr. 247.)

On January 17, 2001, Gorham presented to Oak Grove Medical Clinic with complaints of pain under his right ribs and chest. He was previously seen in ER on July 12, 2001, where he underwent an electrocardiogram (EKG). Gorham also complained of increased emotional symptoms. He stated the chest pain dissipated with Nitro, but he had constant dizziness. He was assessed with somatization disorder, and anxiety/depression. Inderol was prescribed. (Tr. 351.)

12

On May 24, 2001, Gorham presented to Dr. Donohoe for a disability determinations evaluation. He noted Gorham had been incapacitated by dizzy spells, occipital headaches, neck pain and ringing in his ears since April 1997. Donohoe saw Gorham as a patient in August 1997. At that time, Gorham had a four month history of headaches. In April 1997, he had an MRI of the brain that showed a small posterior fossa arachnoid cyst. His EEG at that time was negative. Dr. Donohoe noted that since that time, Gorham had undergone several additional MRIs, CT, and MRA. He had been evaluated by neurologists, Dr. Ahmed and Dr. Jay Robinson, and by three ENT physicians, including Dr. McKenzie, Dr. Dlabal, and Dr. Charles Luetje, a neuro-otologist. Dr. McKenzie felt that the situation was consistent with Meniere's and recommended an endolymphatic shunt. Dr. Luetje felt that this would not be beneficial. Dr. Donohoe further noted Gorham had not worked since August 7, 1997. Gorham's current medications included Effexor and Propranolol. He currently presented with a four year history of persistent vertigo, disequilibrium, headache, panic disorder and depression. On physical examination, Dr. Donohoe indicated that the neurologic examination was normal as it was in August 1997. He noted Gorham had seen multiple specialists without a specific diagnosis. Dr. Donohoe was concerned that Gorham had not improved and that no specific diagnosis had been made. Questions related to somatization and chronic anxiety and depression remained unresolved, but he felt these would best be commented upon by a psychiatrist. From a neurologic perspective, he

Case 4:05-cv-00298-NKL   Document 14-3   Filed 05/15/06   Page 13 of 35

found Gorham's examination normal and indicated Gorham's underlying diagnosis remained an enigma. (Tr. 281-83.)

On June 12, 2001, Gorham presented to Jane W. Ruedi, Ph.D., for a consultative psychological evaluation at the request of the Administration. Gorham stated that about four years ago, he found himself unable to work, having dizzy spells, and severe headaches. (Tr. 284.) Describing the history of his illness, Gorham said he had experienced some dizzy spells as a kid, and remembered getting off the school bus and coming in to lie down. (Tr. 285.) Gorham described his mood as poor. He commented that he had dealt with this situation for four years and no one seemed able to cure it or fix it. He said he cried sometimes. He described his sleep as sporadic, saying that he went through a spell where he only slept fours hours in three days. When asked about the frequency of his panic attacks, he said that he didn't really know what a panic attack would be, but that his physician had told him he was having them. He commented that he now drove only "very low mileage." He considered himself depressed, and believed that this depression started about six months after he had left work. He noted that he had only gone hunting three times last year, and during one of those times he had to lie down in the truck. Describing a typical day, he said he tried to get some laundry done, and perhaps to pick up the house. He did not like to go shopping very much, as walking down the aisles made him dizzy. For entertainment, he might catch one of his son's or daughter's ball games. He used to fish and to hunt, and play softball, but did not do much of it now. He used to enjoy socializing, but not anymore. (Tr. 286.) He reported a four year history of

14

experiencing dizzy spells when encountering stress. Dr. Ruedi indicated that available medial information did not find causation for Gorham's reported physical symptoms. Dr. Ruedi diagnosed undifferentiated somatoform disorder, adjustment disorder with mixed anxiety and depressed mood. His global assessment of functioning (GAF) scale score was 45 which indicates serious symptoms. Diagnostic and Statistical Manual of Mental Disorders, 75 (4th ed. 1994) (DSM-IV). (Tr. 287.) Dr. Ruedi concluded her report by noting that Plaintiff demonstrated the capacity to understand and remember instructions as well as sustain concentration and persistence in tasks. (Tr. 286). She also noted that, in a one-on-one setting, he demonstrated the capacity to interact socially and adapt to his environment. (Tr. 286.)

On September 24, 2001, Gorham presented to Oak Grove Medical Clinic with complaints of dizziness, not driving in one and a half years, and feeling of things getting stuck in his throat. He was assessed with lymphadenopathy, panic attacks, Meniere's diagnosis, and dizziness. His doctor increased his dosage of Remeron. (Tr. 350.)

On March 16, 2002, Gorham presented to Madison Avenue Psychological Services for a therapist initial assessment. He presented with a history of Meniere's disease, panic attacks and unemployment for four years. (Tr. 323.) His risk factors included suicidal thoughts without a plan. (Tr. 324.) He was assessed with major depressive disorder and panic attacks. It was noted he might also be developing agoraphobia. (Tr. 326.) On March 20, 2002, Gorham presented to Oak Grove Medical Clinic for follow up of his medication, lymphadenopathy, increased neck pain, feeling dizzy, not being able to work,

15

and stating he was "going crazy." Physical examination revealed pain in both legs and lumbar spine. He was assessed with lumbar radiculopathy, vertigo, and arachnoid cyst. (Tr. 349.)

On March 26, 2002, Gorham presented to Oak Grove Medical Clinic for an MRI of the brain and lumbar spine. The lumbar results revealed a limbus vertebra at L4, degenerative interspace changes at L4-5 and L5-S1, and degenerative circumferential annular bulging at L5 at L5-S1, elevating and stretching the exiting L5 roots as well as contacting the proximal S1 roots. The brain MRI revealed a simple cyst posterior fossa, left of the midline, undersurface left cerebellar hemisphere, no additional significant abnormality identified, and no abnormal enhancement was seen. (Tr. 346-48.)

On April 6, 2002, Gorham presented to Nabil El Halawany, M.D., for a psychiatric evaluation. He reported feeling very depressed and withdrawn. He said he felt angry at times and was restricted to what he could do. He reported a short temper without violence. (Tr. 337.) His medical problems included Meniere's and high blood pressure for which he had tried multiple medications. Gorham also reported other obsessions to include checking a few times and washing his hands several times. His current medications included Paxil, Effexor, Amitriptyline, and Clonazepam. (Tr. 338.) Mental status examination revealed a depressed mood. Dr. El Halawany diagnosed obsessive compulsive disorder (OCD) and recommended Prozac and Clonazepam medications. (Tr. 339.)

On May 15, 2002, Gorham returned to Dr. El Halawany with no change in his depression. He was still sleeping sporadically. He was still depressed and did not want to leave the house. Mental status examination revealed he was still feeling sad and depressed. His medications included Trazadone, Prozac, and Clonazepam. (Tr. 335.) On May 29, 2002, Gorham returned for follow up. He stated he was better and his depression had decreased. Gorham reported some numbness at his head at times. He said he was sleeping a lot. Mental status examination revealed he appeared in fair hygiene and grooming. His affect was appropriate and his mood eurythmic. (Tr. 334.)

On June 12, Gorham presented to Dr. El Halawany reporting he was sleeping at night and feeling better. He related no suicidal or homicidal thoughts. Dr. El Halawany increased the Prozac dosage and continued Clonazepam. (Tr. 332.) On August 14, 2002, Gorham presented to Oak Grove Medical Clinic for follow up on his medications. He also complained of headache, double vision, chest pain, and paresthesia of his left arm. He was assessed with a history of Meuniere's, polymyalgia, polyarthralgia, and palpitations. He was taking Elavil. (Tr. 345.)

On September 5, 2002, Gorham presented to Dr. El Halawany and reported, "I still get overwhelming feelings that I cannot sleep." Amitriptyline was prescribed to control the headaches. Mental status examination revealed continued dizzy spells. Gorham was warned about the combination of Amitriptyline and Prozac. His Prozac was decreased and Clonazepam was continued. (Tr. 331.)

Case 4:05-cv-00298-NKL   Document 14-3   Filed 05/15/06   Page 17 of 35

On February 3, 2003, Gorham presented to Oak Grove Medical Clinic with complaints of headache, dizziness, chest pain, tinnitus in the left ear, blurry vision in the right eye, increased myalgia, and decreased energy. Physical examination revealed dizziness. He was assessed with otitis serous, hypertension, and polymyalgia. (Tr. 342.) On February 12, 2003, Gorham presented to Dr. El Halawany with complaints of "up and down-mood swings." "I blow up easily. I have been taking the medicine as prescribed, but the ear problems are still there." Mental status examination showed the ringing was worse and his sleep was restless. His medications included Elavil, Prozac, and Clonazepam. (Tr. 330.) On February 19, 2003, Gorham presented to Oak Grove Medical Clinic with complaints of increased ringing in his ears; more left than right. Physical examination reveals decreased hearing. He was assessed with tinnitus, Meniere's, and upper respiratory infection. (Tr. 341.)

On March 19, 2003, Dr. El Halawany completed a Medical Assessment Of Ability To Do Work-Related Activities (Mental) on Gorham. Dr. El Halawany rated Gorham's ability to follow work rules; relate to work co-workers; deal with the public; use judgment; maintain; attention/concentration; and relate predictably in social situations as fair. (Tr. 363-64.) A fair rating indicated the ability to function in an area is seriously limited, but not precluded. (Tr. 363.) Dr/ El Halawany rated Gorham's ability to deal with work stresses as poor or none. (Tr. 363.) Dr. El Halawany indicated Gorham could not tolerate stress for an adequate time to maintain his job and that his attention fades away when he gets very dizzy. He noted Gorham could do simple things at home. Dr. El

Halawany reported that Gorham could not work because of his dizziness and headaches which lead to panic attacks and depression. His wife handled their funds as he could not sustain the attention or have the patience for it. (Tr. 364-65.)

On April 30, 2003, Gorham presented to Jane W. Ruedi, Ph.D., for a psychological evaluation at the request of the Administration. Dr. Ruedi noted that during the administration of the Weschsler Memory Scale-III (WMS-III) and the Weschsler Adult Intelligence Scale-III (WAIS-III), as well as the Trail Making, he appeared to attempt to do his best in tasks presented. When asked about his current mood, Gorham said it was "up and down." He said he got irritated pretty easily and also got bored. His eating was sporadic and he ate about once a day. He only slept about three to four hours a night. While he described the capability of enjoyment, he said he did not go out very often as he was afraid of having dizzy spells. He said he had two to four panic attacks a week. He described these as getting shaky, feeling hot flash and dizziness, with the sensation of passing out. At those times, his breathing was shallow. Gorham said he was capable of caring for his personal needs. He drove very little, probably about three miles a week or less. (Tr. 354.)

Describing a typical day, Gorham said it depended on the day. If he woke up dizzy, he would stay in bed until afternoon and if he had a really bad spell, it could last for several days. He said his body always aches. When asked what he did for fun, he responded that it was not much. On the WMS-III, Gorham earned a General Memory Index Score of 89, within the Low Average Range. He said he had difficulty in hearing

19

due to a really high pitched ringing in his left ear which he had been told was tinnitus. All of the index scores but two were within the average range. These two, which fell within the low average range, were Auditory Delayed and General Memory Indexes. In Trail Making, Gorham completed Part A within 24 seconds, and Part B within 59 seconds, both without error. Both parts of Trail Making fell within Range 1, Average. (Tr. 355.) On the WAIS-III, Gorham obtained an 89 Verbal IQ, 99 Performance IQ, and a 93 Full Scale IQ.

Gorham's Minnesota Multi-Phasic Personality Inventory-2 (MMPI-II) had a validity configuration suggesting either an invalid profile or one of marginal validity. The pattern was probably caused by exaggeration of symptoms due to a cry for help or possible malingering. Diagnoses consistent with the overall profile would be a psycho-physiological reaction or hypochondrias. It would also be consistent with conversion reaction hysterical neurosis, somatoform disorder, and anorexia. Gorham's MMPI-II profile had a validity configuration consistent with a "fake bad" test taking attitude. However, Dr. Ruedi found this puzzling as he appeared to expend adequate effort in other tests administered. Therefore, she noted that indicators of the profile of anxiety and somatization should be given greater weight. (Tr. 356.) She diagnosed undifferentiated somatoform disorder and adjustment disorder with mixed anxiety and depressed mood with a GAF score 45. (Tr. 357.)

On May 28, 2003, Dr. DeBlase reported that Gorham was being treated for constant dizziness and frequent exacerbation that was not relieved by medication. He noted that Gorham's condition made him unable to hold down a full time job. (Tr. 360.)

### B. Hearing

#### 1. Testimony of Darrell Gorham

At a hearing on March 18, 2003, Gorham testified that he was 36 years old and a high school graduate. He was right-handed, stood six feet one inch tall, and weighed 220 pounds. He was married and had two children, aged 11 and 8. (Tr. 41-42.) He last worked in 1997 on an assembly line making car seats for General Motors. He lifted over 50 pounds at this job. He was terminated from that job because he was having dizzy spells and severe headaches. He also worked in the past in road construction and as a drywall worker. Both jobs required lifting over 50 pounds. (Tr. 43-47.)

Gorham testified that he had problems with dizziness for as long as he could remember, but his condition worsened in 1997. (Tr. 49-50.) He used to have attacks once or twice a year, but he currently had bad spells once or twice a week. He had some dizziness every day, but the spells with worse dizziness occurred twice a week. He also experienced headaches and nausea with the dizziness. When he had a severe spell, the room seemed to be rocking and he had to lie down. It could take two hours to a day and a half to get over a bad spell. (Tr. 52-55.)

Gorham stated he had sought treatment from numerous doctors since 1997. His treating physician was treating him for Meniere's disease, stomach problems, headaches,

and arthritis. He had pain in his low back, knees, elbows, and wrists all the time. Lying down worsened the pain in his back and knees. His sleep was affected because of ringing in his left ear 24 hours a day. He said he slept only three to five hours each night. (Tr. 55-58.) He slept during the day. He said he woke up dizzy three or four days a week. (Tr. 58.)

Gorham testified he also suffered from anxiety and panic attacks. He thought this was related to the dizziness because he started having it after the dizzy spells got worse. He described it as tightening of the chest with a panicky, shaky feeling, and fear. He had three or four attacks a week, depending on if he had to go out in public. He had them at home, too. He would usually lie down or sit in a chair after a panic attack and it took two to four hours to get through one. (Tr. 58-60.) Gorham stated he had been seeing a psychiatrist, Dr. Halawany, for a year. He said he could not deal with the situation anymore and felt as though he were having a nervous breakdown. He was depressed and moved the guns from his home because he was afraid of harming his children. He did not care if he lived or died. His psychiatrist put him on medication for mood swings and he said his anxiety had improved. He also suffered from obsessive compulsive disorder, and medication had helped this condition. He said he still got depressed, mainly at night. (Tr. 60-63.)

Gorham described his energy level as low. He said he tired easily and would get dizzy and lightheaded, and would have to sit for 30 to 40 minutes. He said he could not do household chores everyday, only on a good day, and he mowed only half his yard at a

time. Gorham testified he got up with his children in the morning and waited with his son and put him on the school bus. If he was dizzy, he would go back to bed after that. (Tr. 63-65.) On a good day, once or twice a week, his dad would pick him up and take him to his farm to tinker around the garage or look at the cows. Gorham said he missed many of his children's school functions because of dizziness and panic attacks. (Tr. 67-68.) He used to hunt and fish every weekend, but he said he only went once last year. He rarely drove because it made him nauseous and dizzy. He also got dizzy walking up and down the grocery aisles. He said he could not do any of his past relevant work. (Tr. 68-70.)

Gorham testified he could lift 10 to 20 pounds. He said he had trouble walking because he leans in one direction occasionally. He usually only walked 10 to 15 minutes at a time at his dad's farm. He had trouble hearing because of the ringing in his ears and he also had memory problems. He said he did not watch much television or do much reading. He used his computer about three to five minutes each day to check e-mail. (Tr. 72-73, 78-79.) He does the laundry and helps carry groceries. He does not take part in any social activities. (Tr. 79-83.)

The ALJ asked Gorham if he thought he could do his last job if he had not been terminated. Gorham said yes, but in response to a question from his attorney, he explained he thought the ALJ meant could he do the job if he was not sick. (Tr. 83-84.)

### 2. Testimony of Robert Gorham

Gorham's father, Robert Gorham, also testified at the hearing. He said he saw Gorham once or twice a week and spoke with him on the phone every day. He said

Case 4:05-cv-00298-NKL   Document 14-3   Filed 05/15/06   Page 23 of 35

Gorham helped him at the farm, but did no heavy work. He said his son would not get on the farm machinery. (Tr. 85-87.) He testified he had seen his son's spells and he became choked up when talking about it. He said it was hard to see your child like that. Mr. Gorham said his son suffered a severe head injury when he was three years old and had frequent headaches growing up. He fell out of a second story window and they were told he would not live. Mr. Gorham said his son's condition had worsened in the last five years and he could not seem to function or do what he loved to do. He said his son had called him for help when he had a spell and did not know where he was. He also had to pick him up from work several times when he was having a spell. (Tr. 87-92.)

### 3. Testimony of Jody Gorham

Gorham's wife, Jody Gorham, testified at the hearing. When they were first married in 1990, Gorham had spells once or twice a year, but since 1997 he had completely changed. Mrs. Gorham stated her husband regularly had headaches and was dizzy. She said he woke up once or twice a week severely dizzy where he could not function. On those days, she stayed to make sure the children got on the bus. She said his condition worsened suddenly in 1997. Before that, he never missed work. She said he started seeing a psychiatrist after he woke up in the middle of the night having dreamt that he had shot his son with a shotgun. She stated he continued to experience panic attacks where he became short of breath, his chest tightened, and he was very jittery and nervous. She said she saw him in some state of disorientation three or four times a week. (Tr. 93-97.)

### 4. Testimony of Vocational Expert

Amy Salva, a vocational expert (VE), appeared and testified at the hearing at the request of the ALJ. (Tr. 101.) The VE testified Gorham had past relevant work as a drywall laborer, heavy, unskilled; delivery truck driver, heavy, semi-skilled; road construction laborer, heavy, unskilled; heavy equipment operator, heavy, semi-skilled; and production laborer, medium, unskilled. The ALJ then asked the VE a hypothetical question in which he assumed Gorham could not lift or carry more than 10 pounds frequently or 20 pounds occasionally; could not engage in prolonged walking or work activity without the opportunity to alternate sitting and standing at 30 minute intervals; could only occasionally bend, stoop, squat, crouch, crawl, kneel or climb; could not perform work requiring balance, work at unprotected heights or around dangerous equipment, machinery or chemicals, or drive. In addition, he assumed Gorham had mild restriction of activities of daily living; moderate difficulties in maintaining social functioning, preventing more than occasional interaction with co-workers, supervisors or the public without interruption from psychologically-based symptoms; moderate difficulties in maintaining concentration, persistence or pace, not precluding him from completing simple work-related tasks in a timely manner, or understanding, remembering and carrying out simple instructions in a timely manner. (Tr. 104-06.)

In response, the VE testified that Gorham could not perform his past relevant work, but could perform light level unskilled jobs as an assembler or packager; and sedentary unskilled job as an assembler. She stated that these jobs existed in significant

Case 4:05-cv-00298-NKL   Document 14-3   Filed 05/15/06   Page 25 of 35

numbers in the state and national economy.  (Tr. 106-07.)  The VE testified that there would be no work Gorham could perform if he had a moderate degree of difficulty in maintaining concentration, persistence or pace that would prevent him from completing simple tasks in a timely manner; or if he had a marked difficulty in maintaining social functioning that would prevent him from even occasionally interacting with coworkers, supervisors or the public without interruption from pyschologically based symptoms.  (Tr. 107-08.)

Gorham's attorney asked the VE what was the acceptable number of absences in the jobs she had named.  The VE stated that, generally, worker were given one sick day per month.  When asked if lying down was allowed on any of these jobs, the VE testified that there were no jobs existing in significant numbers in the economy that would allow this.  (Tr. 108.)

## II.      The ALJ's Decision

The ALJ found that Plaintiff had not been engaged in substantial gainful activity during the relevant period.  (Tr. 29.)  The ALJ found that Plaintiff suffered from simple arachnoid cyst, posterior fossa; degenerative disc disease of L4-S1, with annular bulging at L5-S1, impinging the nerve roots; chronic dizziness and headaches, etiology unknown (Meniere's disease ruled out by testing); undifferentiated somatoform disorder; adjustment disorder with mixed anxiety and depressed mood; and obsessive compulsive disorder.  (Tr. 29.)  These impairments were severe under the meaning of the Act, but did

not constitute an impairment or combination of impairments listed in or medically equal to one contained in 20 C.F.R. § 404, Subpart P, Appendix 1, Regulations No. 4. (Tr. 29.)

After a review of all of the evidence of record, the ALJ determined that Plaintiff's subjective complaints were not entirely credible. (Tr. 29.) Therefore, the ALJ determined Plaintiff had the residual functional capacity to perform work that did not require him to lift more than 10 pounds frequently or 20 pounds occasionally, engage in prolonged walking, or engage in work activity without having the opportunity to alternate sitting and standing at 30 minutes intervals. (Tr. 29.) He could only occasionally bend, stoop, squat, crouch, crawl, kneel, or climb. (Tr. 29.) Due to intermittent dizziness of unknown etiology, he could not perform any work activity requiring balance, work at unprotected heights, exposure to dangerous or hazardous work materials or conditions, or driving. (Tr. 29.)

His mental impairments caused a mild restriction in daily activities, but still permitted daily self-care, house care, and handling of family financial duties. (Tr. 29.) He had moderate difficulties in maintaining social functioning, which prevented more than occasional interaction with co-workers, supervisors, or the public. (Tr. 29.) He suffered moderate difficulties in maintaining concentration, persistence, or pace, but these limitations did not preclude him from completing simple work-related tasks in a timely manner; or understanding, remembering, and carrying out simple instructions in a timely manner. (Tr. 29.) Based on his residual functional capacity, the ALJ determined Plaintiff was unable to return to past relevant work. (Tr. 29.) Based on the testimony of a

27

vocational expert who appeared at the hearing, the ALJ found that a person of Plaintiff's age, education, work history, and residual functional capacity still retained the ability to perform a significant number of jobs found in the national economy, including jobs as a light assembler, light packager, and sedentary assembler. (Tr. 30.) The ALJ, therefore, determined that Plaintiff was not disabled pursuant to the Act. (Tr. 30.)

## III. Discussion

### A. The ALJ's Credibility Determination Is Not Supported by Substantial Evidence

The Eighth Circuit requires that the ALJ discuss a plaintiff's testimony "in light of the five *Polaski* factors" and to "expressly set forth" any inconsistencies. *Douthit v. Bowen*, 821 F. 2d 508, 509 (8th Cir. 1987). *Polaski* requires consideration of a claimant's daily activities, pain precipitating and aggravating factors, medications, and functional restrictions. *Lynn v. Bowen*, 702 F. Supp. 768, 773 (W.D. Mo. 1988). Those factors are to be demonstrated by examination of all the evidence including the claimant's prior work record, observations by third parties, and treating and examining physicians. *Polaski v. Heckler*, 739 F.2d 1320, 1321-22 (8th Cir. 1984).

In finding Gorham's reports of disabling dizziness, headaches and panic attacks not credible, the ALJ relied heavily on his determination that they were not supported by objective medical evidence. (Tr. 27.) An ALJ cannot disregard a plaintiff's subjective claims just because they are not supported by objective medical evidence. *Cockerham v. Sullivan*, 895 F.2d 492, 496-97 (8th Cir. 1990); *Simonson v. Schweiker*, 699 F.2d 426, 429 (8th Cir. 1983); *McDonald v. Schweiker*, 698 F.2d 361, 365 (8th Cir. 1983); *Cole v.*

28

*Harris*, 641 F.2d 613, 615-16 (8th Cir. 1981). The ALJ must be able to point to some inconsistency in the plaintiff's testimony or some other circumstance to support a decision that the testimony is not credible. *Simonson*, 699 F.2d at 429. Gorham consistently reported his symptoms of dizziness, nausea, and headaches to numerous doctors dating to the time of his alleged onset date in April 1997. He continued to seek treatment for his symptoms over the next years. (Tr. 234-35, 238-40, 252-58, 260-65, 281-87, 323, 337-39, 342, 345, 346-51, 360.) He had MRIs of his head and back, EEG, rotary chair testing, and infrared ocular motor analysis. (Tr. 226-27, 234-35, 253-54, 264, 346-48). He consulted with multiple specialists; including a neurologist; ear, nose, and throat specialist; and neurotologist. (Tr. 214, 238-40, 261, 266.) Throughout all of this, he continued to report episodes of severe dizziness and headaches, nausea, and occasional tinnitus.

The ALJ found no objective medical evidence supporting a diagnosis of headaches and dizzy spells. (Tr. 26.) After noting that Dr. Luetje "ruled out" Meniere's disease and that all neurological tests had been normal, the ALJ cut off testimony regarding Meniere's disease. (Tr. 36-37.) But this disease was listed frequently in Gorham's medical records. Although the specialists did not settle on a specific diagnosis for Gorham, none of his doctors questioned the validity of his symptoms. Indeed, a June 29, 1998, letter from Dr. Luteje to Dr. DeBlase indicated that it was hard to precisely diagnose the problem and he believed there was some connection between the anxiety and panic spells, and Gorham's

vestibular function. (Tr. 234-35.) Gorham cannot be faulted for the failure of a proper diagnosis. *Rasor v. Massanari*, 201 F. Supp. 2d 976, 987 (E.D. Mo. 2001).

The ALJ also selectively noted that Dr. Ruedi diagnosed somatoform disorder or hypochondrias, and that there was a possibility of malingering due to a "fake bad" result on his MMPI-II inventory assessment. (Tr. 26, 356.) However, Dr. Ruedi noted that Gorham's results were also consistent with conversion reaction hysterical neurosis and anorexia, and that interpretation of the test results "must be viewed with caution." (Tr. 356.) She further questioned the validity of a "fake bad" test result because Gorham "appeared to expend adequate effort in other tests administered."

Dr. Ruedi examined Gorham initially on June 12, 2001, and concluded he suffered undifferentiated somatoform disorder, and adjustment disorder with depressed mood. She assigned a GAF of 45 which would indicate serious and disabling psychological problems. (Tr. 284-87.) After the hearing, the ALJ ordered Gorham to submit to further cognitive testing. Although the ALJ disregarded much of Dr. Reudi's previous observations, he sent Gorham back to her instead of a different psychologist. Dr. Ruedi re-evaluated Gorham on April 30, 2003, and gave the same diagnoses and again assigned a GAF of 45. (Tr. 352-57.)

Ultimately, the ALJ accorded weight to only parts of Dr. Ruedi's opinion. The ALJ stated: "Again, Dr. Ruedi's GAF assessment of 45 is accorded no weight, because it is inconsistent with her benign findings on mental status examination and psychological testing of claimant, including . . . a probable confirmation of malingering on MMPI

30

testing . . . ."  (Tr. 24.)  But, as noted above, Dr. Ruedi had not characterized the test results as showing probable malingering.  Rather, she interpreted the test results as consistent with conversion reaction, somatoform disorder and anorexia.  She stated that the "fake bad" responses on some of the testing was "puzzling as he appeared to extend adequate effort in other tests administered.  Therefore, indicators of the profile of anxiety and somatization [should] be given greater weight."  (Tr. 356.)  Dr. Ruedi took into consideration all of the test results, as well as Gorham's presentation and an interview with his wife to reach her conclusion concerning his functional capacity as indicated by a GAF of 45.  The ALJ's contrary interpretation of Dr. Ruedi's test results is not supported by substantial evidence.

The ALJ also ignored the opinion of Gorham's treating psychiatrist, Nabil El-Halawany, M.D.  Dr. Halawany reported that Gorham was disabled because of dizziness and headaches which led to panic attacks and depression.  The Eighth Circuit requires that an ALJ give substantial weight to the treating physician's opinion in evaluating a claim for disability unless it is unsupported by evidence or merely conclusory.  *Thompson v. Bowen*, 850 F.2d 346, 349 (8th Cir. 1988); *Douglas v. Bowen*, 836 F.2d 392, 395 (8th Cir. 1987); *Piercy v. Bowen*, 835 F.2d 190, 191-192 (8th Cir. 1987); *Turpin v. Bowen*, 813 F.2d 165, 170-171 (8th Cir. 1987).  Instead, the ALJ simply dismissed Dr. El Halawany's opinion without discussion.  However, Dr. El Halawany's opinion is supported by medical evidence and is consistent with the finding of Dr. DeBlase, another treating physician.  Dr. DeBlase reported that Gorham was being treated for constant

dizziness with frequent exacerbations that were not relieved by medication. He believed that Gorham's condition made him unable to hold down a full time job. (Tr. 360.)

The ALJ overlooked several years of treatment for debilitating dizziness and headaches by multiple doctors, none of whom questioned the validity of his symptoms. Instead, the ALJ focused on the absence of a consistent diagnosis and one out-of-context comment about possible but improbable malingering to discount the overwhelming evidence of disability. His assessment of Gorham's credibility is not supported by substantial evidence.

**B.** **The ALJ's Conclusion that Gorham's Daily Activities Belied Disability Is Not Supported by Substantial Evidence.**

The ALJ cited Gorham's testimony regarding his daily activities as evidence of his ability to work. (Tr. 27.) Although daily activities alone do not disprove disability, they are a factor to consider in evaluating subjective complaints. *See, e.g., Davis v. Apfel*, 239 F.3d 962, 967 (8th Cir. 2001); *Wilson v. Chater*, 76 F.3d 238, 241 (8th Cir. 1996). However, "[t]he ability to do light housework with assistance, attend church, or visit with friends on the phone does not qualify as the ability to do substantial gainful activity." *Thomas v. Sullivan*, 876 F.2d 666, 669 (8th Cir. 1989); *accord Wilcutts v. Apfel*, 143 F.3d 1134, 1137 (8th Cir. 1998); *Ingram v. Chater*, 107 F.3d 598, 604 (8th Cir. 1997); *Rainey v. Department of Health & Human Services*, 48 F.3d 292, 293 (8th Cir. 1995); *Neely v. Shalala*, 997 F.2d 437, 442 (8th Cir. 1993); *Cline v. Sullivan*, 939 F.2d 560, 566 (8th Cir. 1991); *Kouril v. Bowen*, 912 F.2d 971, 975 (8th Cir. 1990); *Easter v. Bowen*, 867 F.2d 1128, 1130 (8th Cir. 1989).

Gorham did testify that on good days he could do laundry, mow one half of his yard, or go spend time with his father at his farm.  (Tr. 64-66.)  In particular, the ALJ noted "light activities" on the farm such as "holding onto a board or holding gates open" was evidence that Gorham was more able to work than he claimed.  (Tr. 27.)  Although Gorham evidently told Dr. Reudi that he sometimes coached his daughter's little league ball games (Tr. 354), he testified that he rarely drove and missed many of his children's school functions for fear of having a dizzy spell or anxiety attack.  (Tr. 67-69.)  He stated that the severe spells occurred one or two times a week and would require that he lie down until they passed, sometimes in several hours, sometimes in a day and a half.  (Tr. 52-53, 55.)  This testimony was supported by the testimony of Gorham's wife and father. (Tr. 89, 94, 97.)

The ALJ also cited inconsistencies in Gorham's claims regarding his abilities.  For example, during his hearing Gorham claimed he could not concentrate sufficiently to use money or handle family finances; however, the ALJ noted that Gorham had told Dr. Ruedi that he had a checkbook and shared money duties with his wife.  (Tr. 49, 79, 354.) In fact, Gorham told Dr. Reudi on his second consultation that "he has a checkbook and he and his wife manage their funds together."  (Tr. 354.)  In his previous consultation with Dr. Reudi, Gorham had said that his wife kept the checkbook, though he considered himself capable of doing so.  (Tr. 286.)  While these statements are somewhat inconsistent, they are not substantial evidence that Gorham was capable of "handling family financial duties."  (Tr. 29.)  At best, Gorham's daily activities demonstrate

Case 4:05-cv-00298-NKL   Document 14-3   Filed 05/15/06   Page 33 of 35

occasional periods of upright mobility and concentration punctuated by frequent, unpredictable periods of incapacitation.

### C. The ALJ's Finding that Gorham Can Perform Other Work in the National Economy Is Not Supported by Substantial Evidence.

The ALJ determined that Gorham could not perform his past relevant work. (Tr. 30.) When a claimant has demonstrated a medically determinable disability of such severity that he cannot perform his former work, the burden shifts to the Commissioner, who must prove that the claimant can perform some type of substantial gainful employment. *Folks v. Secretary of Department of Health and Human Services*, 825 F.2d 1259, 1261 (8th Cir. 1987); *Bradshaw v. Heckler*, 810 F.2d 786, 789 (8th Cir. 1987).

Dr. Halawany reported that Gorham had poor or no ability to deal with work stresses; and his ability to interact with supervisors, maintain attention/concentration, relate to co-workers, and follow work rules was seriously limited but not precluded. (Tr. 363-64.) At the hearing, the VE testified that there would be no work Gorham could perform if he had a moderate degree of difficulty in maintaining concentration, persistence, or pace. (Tr. 107.) Furthermore, the VE stated that there was no work Gorham could perform if he had to lie down during the work day or had to miss more than one day of work each month because of his condition. (Tr. 108.) The ALJ's conclusion that Gorham could work as a light assembler, light packager, or sedentary assembler did not take the VE's testimony into account, however, because he discredited the factual basis for the VE's testimony. Instead, he considered only the testimony based on his inflated assessment of Gorham's residual functional capacity. As there is not

34

substantial evidence to support that assessment, his reliance on selective portions of the VE's testimony does not establish that jobs exist in the national economy that Gorham can realistically perform and maintain.  The ALJ's conclusion is not supported by substantial evidence.

**IV.    Conclusion**

Accordingly, it is hereby

ORDERED that Gorham's Motion for Summary Judgment [Doc. # 8] is GRANTED.  The decision of the ALJ is REVERSED, and the Commissioner is ordered to pay benefits.

s/ Nanette K. Laughrey
NANETTE K. LAUGHREY
United States District Judge

Dated: May 15, 2006
Jefferson City, Missouri